512 So.2d 1259 (1987)
RICE RESEARCHERS, INC. and Fidelity and Deposit Company of Maryland
v.
Richard B. HITER, Loyd H. Canady, Arthur Hughes Williams and Barton Williams.
No. 56630.
Supreme Court of Mississippi.
September 2, 1987.
*1260 Benjamin E. Griffith, Robert S. Crump, III, Griffith & Griffith, Cleveland, for appellants.
*1261 Jeffrey A. Levingston, Levingston & Levingston, Cleveland, J. Robertshaw, Robertshaw, Terney & Noble, Greenville, for appellees.
Before WALKER, C.J., and ROBERTSON and ANDERSON, JJ.
ROBERTSON, Justice, for the Court:

I.
Today's appeal involves us in a charge of stealing rice. The alleged thief is not an ordinary thief, but a renowned and respected pioneer in the development of high quality and highly successful rice varieties who left his employer's service and was then accused of taking with him that which was not his.
The Chancery Court granted the employer preliminary injunctive relief. In the end the Court held there was no theft at all. As the questions presented on this appeal are largely ones of fact, we decline to disturb that which was done below. We affirm.

II.

A.
On September 10, 1984, Rice Researchers Inc. (hereafter "RRI"), a California corporation, filed in the Chancery Court of the First Judicial District of Bolivar County, Mississippi, an application for a Temporary Restraining Order, Preliminary Injunction, Permanent Injunction, and Appointment of Receiver. Named as Defendants were two Bolivar County farmers, Richard B. Hiter (hereafter "Hiter") and Loyd H. Canady (hereafter "Canady"). RRI alleged that Hiter and Canady, acting in concert with RRI's former research director, Arthur Hughes Williams (hereafter "Williams"), had wrongfully misappropriated and were then growing proprietary varieties of rice owned by RRI, including Kokuho Rose, a high quality strain of rice produced through costly genetic research. RRI sought to enjoin Hiter and Canady from harvesting, transferring and otherwise exploiting and profiting from Kokuho Rose rice and other rice then being grown in certain rice fields located east of Benoit, Mississippi.
On the next day, September 11, 1984, the Chancery Court issued a Temporary Restraining Order enjoining Defendants Hiter and Canady from harvesting, marketing, transferring, removing or in any manner handling or continuing rice farming operations with respect to Kokuho Rose rice and other experimental varieties of rice growing upon certain rice fields east of Benoit. The Court set September 19, 1984, as the date for a hearing on RRI's application for a preliminary injunction and an appointment of a receiver.
On September 20, 1984, the Chancery Court issued the preliminary injunction requested by RRI and see the cause for hearing on the merits. Thereafter, RRI filed an amended complaint and amended application for permanent injunction, bringing in as additional parties RRI's former research director, Arthur Hughes Williams, and his son, Barton Grant Williams (hereafter "Barton"). Subsequently on January 9, 1985, the hearing on the merits began.
On March 12, 1985, the Chancery Court released Findings of Fact and Conclusions of Law holding in favor of the Defendants, Hiter, Canady and the Williamses. Following a hearing to determine damages, the Court entered its Final Judgment dated March 27, 1985. In its Final Judgment, the Court ratified its original Findings of Fact and Conclusions of Law and incorporated them into the Final Judgment with only minor modifications. However, the Court denied RRI's motion to amend the original Findings of Fact and Conclusions of Law.
In its Final Judgment, the Court dismissed RRI's complaint as amended, with prejudice; dissolved the temporary restraining order and preliminary injunction; permanently enjoined RRI and its officers, agents, servants, employees and attorneys and others in active concert with them having actual notice of the Judgment from prosecuting any claim within the ambit of the complaint in that cause against Williams, Barton or any others acting in concert with them; and took under advisement the amount of damages suffered by *1262 the Defendants and the amount of attorneys fees and expenses to be allowed. Thereafter, the Court issued an order awarding the Defendants damages and denying stay pending appeal.[1]

B.
Beneath the plethora of facts and testimony, charges and countercharges, this lawsuit boils down to a rather simple dispute. Rice Researchers, Inc. (RRI) claims that Arthur Hughes Williams stole protected varieties of rice seed from RRI and later planted these on the E.M. Barry Place near Benoit, Mississippi, planning to sell rice harvested from such planting. Williams, on the other hand, admits planting seed rice on the Barry Place but says he did not steal it. Williams contends that such rice was obtained via hand-harvesting another rice field and rice abandoned by RRI upon the closing of its research operation in Mississippi at the end of 1982. The Chancery Court found for Williams, and RRI appeals. Because this simple suit should not be dispatched so simply, we will review the facts in more detail.
RRI is a California corporation engaged in the business of conducting research and developing various types of strains of rice. Arthur Hughes Williams is a renowned rice breeder, having developed a highly successful, high quality rice known as Kokuho Rose rice. When Williams originally developed Kokuho Rose, he and Koda Farms owned it. In January, 1968, Williams transferred to RRI all of his right, title and interest in Kokuho Rose together with other proprietary information and research. In October, 1968, RRI entered into a joint venture agreement with Pacific International Rice Mills, Inc. (hereafter PIRMI) and Nomura and Company (hereafter Nomura) for the orderly production and marketing of Kokuho Rose. RRI was responsible for seed varieties production and maintenance, PIRMI was responsible for production and Nomura was responsible for marketing.
In November, 1968, Williams entered into an employment agreement with RRI, and in June, 1973, RRI and Williams executed a second employment agreement. In both employment agreements Williams agreed to refrain from disclosing to third persons any matters affecting or relating to the business of RRI. Further, the employment agreements provided that all ideas, improvements or other developments conceived by Williams within the scope of RRI's business were the exclusive property of RRI.
In August, 1973, PIRMI and Nomura each bought fifty percent of RRI. Williams continued to work under essentially the same employment agreement as he did prior to the sale.
In October, 1978, PIRMI, Nomura and RRI entered into a second joint venture agreement with all terms essentially the same as in the first, although at this time RRI was completely owned by PIRMI and Normura. Koda Farms, however, continued to own the trademark "Kokuho Rose" as a result of the previous agreement between Koda Farms and Williams. Koda Farms had given Nomura exclusive rights to use the Kokuho trademark in the marketing, distribution and sale of Kokuho Rose rice.
In 1980, RRI established a research station on a 149.5 acre tract leased from Dahomey *1263 Plantation near Benoit, Mississippi. RRI planned to carry out research activities in conjunction with its previously established research station in California. Williams agreed to move from RRI's research station in California, where he served as Research Director, to the newly established research station in Mississippi, where he continued to serve as Research Director. Williams was assisted by Dr. Lorenzo Pope, a plant breeder with RRI since 1975, in coordinating the research efforts between the California and Mississippi research stations.
Williams served as Research Director of the Mississippi facility until the end of 1982. On December 17, 1982, as a result of his disagreement with the corporate decision to sell PIRMI to Comet Rice Mills, Williams resigned effective December 31, 1982. Dr. Lorenzo Pope was named Williams' successor as Research Director at the Mississippi facility.
Only after Williams severed his relationship with RRI did the seeds so planted germinate into the present controversy.[2] RRI's version of the story is that Williams, acting in concert with Hiter and Cannady, the two Bolivar County rice farmers, grew protected varieties of rice on the E.M. Barry place in 1984. Specifically, RRI alleges that Williams grew Kokuho Rose rice and a particular strain of rice designated by the number 75-30-1. RRI alleges that these strains of rice were protected varieties owned by RRI and that Williams stole and planted them.
RRI points to several instances of testimony in evidence which it contends supports its version of the story. Specifically, RRI alleges that before his termination with the company, Williams contacted Japan Foods Corporation proposing to enter into a joint venture with that company to produce, sell and market Kokuho Rose varieties of rice to be grown by Williams in Mississippi. RRI also points to the testimony of Carlton Bruce and Ren Fairbanks, both contract growers for RRI, alleging that Williams contacted them in May, 1983, requesting that they ship him Kokuho Rose rice seed. RRI also points to the testimony of Buddy Stanford, a rice farmer in Bolivar County, asserting that Williams held a meeting in which he sought growers for a medium-grain rice, specifically Kokuho Rose. RRI refers to Williams' field nursery book and increase notes made during the 1983 growing season, contending that these documents indicate that Williams grew Kokuho Rose and other proprietary varieties on the Barry Place in 1984. RRI also refers to testimony indicating that Williams stored rice seed in a local storage facility in Bolivar County in 1983. And, finally, RRI alleged that in May, 1983, Williams and his son, Barton, made a trip to California where they stole Kokuho Rose seed from a farm operated by the Church of Latter Day Saints (L.D.S.), a contract grower for RRI.
Dr. Lorenzo Pope was RRI's main witness at both the hearing on the preliminary injunction and the hearing on the merits. RRI called several other witnesses to buttress the above charges and to prove additional facts. RRI attempted through several witnesses to disprove Williams' claim that the source of part of the rice planted on the Barry tract was hand-harvested rice from a nearby field. RRI also sought to establish that Kokuho Rose was indeed a proprietary variety of rice, and not just a brand name.
Williams denies that he stole any proprietary strains of rice or anything else that belonged to RRI. He insists that the rice grown on the Barry Place in 1984 was hand-harvested from a nearby field and obtained from rice abandoned by RRI when RRI closed its research facility in Mississippi, and that the evidence and testimony in the record abundantly establish these facts. Specifically, Williams testified that no Kukuho *1264 Rose or 75-30-1 variety of rice was planted on the Barry Place in 1984. He testified that he did plant Kokuho Rose and 75-30-1 varieties for experimental purposes in 1983, but he planted none in 1984 as he had destroyed all that was planted in 1983. Williams pointed to the testimony of co-defendants Richard Hiter and his son, Barton, as supporting his contention that rice planted on the Barry tract consisted of part of hand-harvested rice and rice abandoned by RRI. Williams testified that he was in Africa during the planting season of 1984 and did not plant any rice. He acknowledges, however, that he assisted Hiter and Cannady in planting the Barry tract by providing a planting plan to Cannady and providing rice for them.
Williams admits other facts charged by RRI but offers exonerating explanations. Specifically, Williams admitted calling Carlton Bruce and Ren Fairbanks and asking about Kokuho Rose rice but said that he made the calls because a friend of his was interested in obtaining Kokuho Rose. Williams did contact officials of Japan Foods Corporation but denied asking them about the possibility of a joint venture involving Kokuho Rose. He met with Delta farmers about growing medium-grain rice but never mentioned Kokuho Rose. As to the field nursery book and increase notes, Williams testified that all the rice planted on the Barry tract in 1984 was included in the materials. Williams admitted contacting B & J Services to dry rice but denies that it was Kokuho Rose rice that he sought to dry. He denied getting seeds from the Bostick Brothers Warehouse.
Williams admitted making the California trip with his son, Barton, the primary purpose being that he had some chemical business that he needed to take care of as a result of his employment with Greater Yields, Inc., a chemical company. Williams testified that he and Barton went to an experiment station while in California because Dr. Pope said he had some genetic material that he wanted Williams to take back with him. Williams denied going to the L.D.S. Farm. Barton substantiated this testimony. Sandra Cervantes, who rode back part of the way in the van with Williams and his son, substantiated Williams' testimony.
There is more, much more. The summary of charges and countercharges, denials and rebuttals, conveys the sense and essence of what the Chancery Court had before it. Though details are omitted, this captures fairly the coloring and flavoring available to the Chancery Court with which to practice its culinary art. Though the manner of service of the feast causes disquiet, as we will note below, the Court in the end invited Williams, his son Barton, and the two Bolivar County farmers to the table. Miffed at its judicially imposed fast, RRI appeals.

III.

A.
A word about our scope of review. Where  as here  a trial judge sits without a jury, this Court will not disturb his factual determinations where there may be found in the record substantial supporting evidence. Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); Gilchrist Machinery Co., Inc. v. Ross, 493 So.2d 1288, 1292 (Miss. 1986); Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983); Culbreath v. Johnson, 427 So.2d 705, 707-09 (Miss. 1983); Richardson v. Riley, 355 So.2d 667, 668 (Miss. 1978). This is true whether the findings relate to matters of evidentiary fact or ultimate fact. Norris, 498 So.2d at 814; Gilchrist, 493 So.2d at 1292; Spain v. Holland, 483 So.2d 318, 320 (Miss. 1986); Carr v. Carr, 480 So.2d 1120, 1122 (Miss. 1985); Cheek v. Ricker, 431 So.2d 1139, 1143 (Miss. 1983).
Put another way, this Court must affirm a chancellor on a question of fact unless upon review of the record we be left with the firm and definite view that a mistake has been made. UHS-Qualicare, Inc. v. Gulf Coast Community Hospital (Miss. No. 56,389, decided Aug. 19, 1987) (not yet reported); Harkins v. Fletcher, 499 So.2d 773, 775 (Miss. 1986); Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986); Will of Polk, *1265 497 So.2d 815, 818 (Miss. 1986). This Court must examine the entire record and accept
that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact, must be accepted.
Cotton, 435 So.2d at 685.
And, finally, the trial judge, sitting in a bench trial as the trier of fact, has sole authority for determining credibility of the witnesses. Hall v. State ex rel. Waller, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963).
Today's case presents a variation upon this familiar theme. The detailed findings of fact below resulted from the trial judge's approving almost verbatim the post-trial proposed findings of fact submitted by counsel for Defendants. These findings simply are not the same as findings independently made by the trial judge after impartially and judiciously sifting through the conflicts and nuances of the trial testimony and exhibits. The matter is important, because the primary reason the law limits our scope of review is that the trial judge uniquely situated, both institutionally and pragmatically, to "smell the smoke of the battle." Culbreath v. Johnson, 427 So.2d 705, 708 (Miss. 1983). Here the trial judge was a non-smoker.
Still, we cannot and will not review this case de novo. Obviously, the Chancery Court was of the view that over all Defendants Williams, et al., had the better of the battle. That determination is entitled to deference, though sensibly not as much as in the ordinary case.

B.
RRI formally assigns as error the Chancery Court's verbatim adoption of Defendants' proposed findings of fact and conclusions of law. RRI cites federal cases holding in disfavor the mechanical or wholesale adoption by a trial court of findings of fact and conclusions of law submitted by the prevailing party. See George W. Bennett Bryson & Co. Ltd. v. Norton Lilly & Co., Inc., 502 F.2d 1045 (5th Cir.1974); Kelson v. United States, 503 F.2d 1291 (10th Cir.1974); Hagans v. Andrus, 651 F.2d 622 (9th Cir.1981). RRI contends that while such a practice may not constitute reversible error in and of itself, the appellate courts in such a case must engage in much more careful analysis of adopting findings than in cases where the findings and conclusions have been authorized by the trial judge himself. Amstar Corp. v. Dominos Pizza, Inc., 615 F.2d 252 (5th Cir.1980). With this we agree. While an appellate court may not summarily disregard findings adopted by a trial judge verbatim from the submission of the prevailing party, the appellate court must view the challenged findings of fact and the appellate record as a whole with a more critical eye to ensure that the trial court has adequately performed its judicial function. Ramey Construction Co., Inc. v. Apache Tribe of Mescalero Reservation, 616 F.2d 464 (10th Cir.1980); Otero v. Mesa Co. Valley School District No. 151, 470 F. Supp. 326, 328 (D.C.Colo. 1979). RRI contends that courts have repeatedly held to the principle of favoring factual findings drawn with the insight of a disinterested mind as opposed to adopting findings of fact verbatim. Relex Corp. v. Speed Check Corp., 457 F.2d 1040, 1042 (5th Cir.1972).
A number of courts have indicated that it is not improper in itself for a trial judge to adopt part or all of the findings proposed by counsel for the prevailing party. See Annot., Propriety and Effect Of Trial Court's Adoption of Findings Prepared By Prevailing Party, 54 A.L.R.3d 868, 870, 872-76 (1974 and Supp. 1986); 76 Am.Jur.2d Trial § 1256.5 (1975 and Supp. 1986). Some states have statutes or rules of procedure delineating requirements regarding findings of fact and conclusions of law, which affect a court's view of the lower court's adoption of findings and fact and conclusions of law proposed by the prevailing party.[3] 54 A.L.R.3d 881-86. Some states, *1266 however, have indicated disapproval of the practice of adopting wholly or in substantial part findings prepared by counsel for the prevailing party. 54 A.L.R.3d 876-79. Even in states with rules or statutes pertaining to findings of fact and conclusions of law, attitudes vary. 54 A.L.R.3d 880-86.
In our view, the matter of whether a trial court may adopt verbatim, in whole or in part, the findings of fact and conclusions of law of a party is within the court's sound discretion. See 54 A.L.R.3d 868, supra. Case complexities and crushing caseloads necessitate substantial reliance upon the submissions of trial counsel. Still, the judge is a judge and not a rubber stamp. He may not be able to afford the luxury of practicing his culinary art a la the Cordon Bleu. He should remember, however, that his oath precludes a McDonald's approach to the judicial process. Where the trial judge wholly abdicates his judicial responsibilities  where, as it were, he abuses his discretion  we doubtless have authority to intervene. Here the Chancery Court quite properly requested that each party submit proposed findings of fact and conclusions of law. These submissions were considered at an adversary hearing. Thereafter, the Court considered RRI's motion to amend findings. These steps, coupled with the fact that this case is quite complex (in spite of its simplicity), leave us convinced that the Chancery Court acted within its authority. As indicated above, however, our obligation of appellate deference to such findings is necessarily lessened.

IV.
Our sensitivity to the possibility of error heightened, we confront RRI's primary assignment of error, namely that the Chancery Court erred in finding that Williams stole no RRI rice and, conversely, that what rice Williams had and had planted in 1984 he came by honestly.
RRI challenges the Chancery Court's findings generally and then directs our attention to seven specific subsidiary findings. To be candid, two of those  in the form of deductions regarding what varieties of rice were grown on the Barry Place  appear a bit exaggerated, no doubt owing to their having been drafted by zealous counsel. No matter. The core questions concern the nature, amount and source of the rice planted by Williams and the others on the Barry place. Although there be substantial credible evidence to the contrary, we regard resolution of these questions in favor of Defendants within the Chancery Court's authority.
The theft claim first. The heart of RRI's claim that Williams wrongfully obtained protected varieties of rice is that Williams and his son, Barton, came to California in a van and took Kokuho Rose rice from the storage bins maintained by the Latter Day Saints, a contract grower for Rice Researchers in California. Williams admits that he and his son traveled to California in May, 1983, and that they obtained rice. Williams' son, Barton, substantiates this testimony. However, Williams' testimony and Barton's was that Dr. Pope gave them bags of rice to take back to Mississippi, and that they did nothing. Also substantiating Williams' and Barton's story is the testimony of a witness, Sandy Cervantes, who rode with them in the van back from California. Cervantes testified that there were bags of rice placed in the wells of the van and that there was a mattress in the back of the van. Further, Dr. Pope, when asked if he saw whether rice was in the van, testified that he did not see whether rice was in it. Based on this testimony, the Chancery Court's gross conclusion that Williams did not steal any RRI rice is within the evidence and will not be disturbed.
Next, what was grown on the Barry Place. RRI argues that, to the extent the Chancery Court found that no genetic materials *1267 obtained by Williams from RRI were planted on the Barry Place, the Court was manifestly wrong. RRI points to two instances of testimony supporting its view. First, RRI contends that neither Williams nor any of the other Defendants accounted for the fact that Williams had in his possession as of October, 1983, one thousand bushels of Kokuho Rose, and that Williams called Bobby Horton of B & J Services, Inc. on October 13, 1983, and requested him to dry a variety of rice known as M-1301, which RRI contends is a designation for Kokuho Rose. Additionally, RRI argues that the Chancery Court totally disregarded the uncontradicted testimony of Williams himself, corroborated by his 1983 field nursery book, that he grew a substantial quantity of Kokuho Rose on his twenty acre tract in 1983 and also grew many other varieties of rice on that same tract in 1983, which he allegedly admitted he acquired from his former employer, RRI.
However, evidence was presented establishing that Williams legitimately obtained the rice planted on the Barry Place. Richard Hiter, one of the Defendants, testified that the source of the rice planted on the Barry tract was from hand-harvested rice and rice abandoned by RRI when it closed its Mississippi Research facility. Williams' testimony was the same. Barton's testimony supports Williams' version as well. Again the Chancery Court's gross conclusion was within the evidence.
RRI argues that the Chancery Court's ultimate fact issue of abandonment was manifestly wrong and contrary to the great weight of the competent evidence. RRI's view of the evidence includes the fact that RRI was forced to resort to litigation in March, 1983, to prevent Williams, its former research director, from surreptitiously acquiring RRI's proprietary varieties by covert business contacts with a third party; the fact that RRI had every legal right to keep any amount of rice it chose to keep in storage at the storage bins of B & J Services, Inc., in Cleveland, Mississippi, in 1983; that RRI never failed to retain title to the rice stored in those bins; that at or about the time that Williams announced his intention to quit as research director of RRI in 1982, he was directed to immediately make arrangements to ship RRI's entire inventory of California medium grain seed, Kokuho Rose, and other varieties, to California; that thereafter Dr. Pope was instructed to go to Mississippi in the early part of 1983 to take inventory and physical possession of all of RRI's materials, equipment and notes and to establish that status of RRI's various projects under Williams' direction, for the purpose of securing its materials; that after Williams quit as research director, he began pilfering rice samples from the B & J Services storage facilities and had complete access to anything stored at those facilities until his actions were brought to the attention of RRI and he was stopped on instructions of RRI; and that on both occasions in January and April, 1983, when Dr. Pope was at the research station site in Mississippi, no seed stock or other property of RRI was knowingly left at the site.
Intent to abandon along with an external act or omission to act manifesting such intent are the crucial factors in determining whether one has abandoned property. Columbus & Greenville Ry. Co. v. Dunn, 184 Miss. 706, 720, 185 So. 583, 586 (1939); 1 C.J.S. Abandonment § 4 (1985); 1 Am.Jur.2d Abandoned, Lost, Etc. Property, § 15 (1962); see also Yellow Cab Co. of Biloxi v. Checker Taxi Cab Owners Association, 233 Miss. 735, 740, 103 So.2d 350, 352 (1958). Determining such intent involves resolution of what is essentially a question of fact, albeit a rather intangible and subjective one. Dunn, 184 Miss. at 720, 185 So. at 586; 1 C.J.S. Abandonment § 11; 1 Am.Jur.2d Abandoned, Lost, Etc. Property § 39; see also Bunge Corp. v. Agri-Trans. Corp., 542 F. Supp. 961, 969 (N.D.Miss. 1982) aff'd. in part, vac. in part, Agri-Trans. Corp. v. Gladders Barge Line Co., Inc., 721 F.2d 1005 (5th Cir.1983) (whether sunken wreck has been abandoned is question of fact). Direct evidence of an intent to abandon property or property rights is not required, for intent may be inferred from all of the circumstances. Dunn, 184 Miss. at 720, 185 So. at 586; 1 C.J.S. Abandonment § 5(b). Such intent, *1268 however, must be proven by full and clear evidence. Southern Bell Telephone & Telegraph Co. v. City of Meridian, 241 Miss. 678, 703, 131 So.2d 666, 675 (1961); Dunn, 184 Miss. at 720, 185 So. at 586.
Determining whether RRI abandoned rice after closing its Mississippi research facility was essentially a question of fact. As such, this Court must determine whether, based on substantial evidence, the Chancery Court was manifestly wrong in finding that RRI did indeed abandon such rice. The record contains substantial, conflicting testimony. Since credibility choices necessarily must be made en route to resolution of this question, we are ill equipped  and disposed  to engage in de novo consideration of the point. We hold that a matter of law, the rice left behind by RRI when it closed down its Mississippi operations was abandoned.
RRI complains much of the "finding" that "Kokuho Rose" is identified in the minds of the public with the trademark, not with any particular selection of rice sold under that trademark. But nothing turns on the point. The outcome determinative questions are, what rice was planted on the Barry place and did Williams and the others come by it honestly? Those questions answered, the present complaint is reduced to semantical irrelevancy.

V.

A.
RRI asserts that Williams made an unlawful and improper disclosure of trade secrets and confidential matters and information owned by his former employer and as such should not have been permitted to profit from his own wrongdoing. RRI claims that the evidence in the record clearly establishes Williams' improper disclosure of trade secrets. For example, RRI contends that Williams' contact with Japan Foods Corporation in December, 1982, indicated improper disclosure of trade secrets. Also, there was evidence that Williams removed samples of RRI's seed rice stored at B & J Services warehouse. Additionally, RRI contends that evidence showed that Williams solicited Bolivar County rice farmers in 1984 to grow Kokuho Rose rice.
Williams, on the other hand, argues that because he rightfully had possession of the rice planted on the Barry Place, he became free to do whatever he wanted with that rice, so long as he did not unfairly compete with RRI. Williams argues that because Koda Farms owns the trademark to Kokuho Rose, there is no way that he can compete with RRI or the joint venture of which RRI is a part.
A trade secret has been defined as
Any formula, pattern, device, or compilation of information which is used in one's business and which gives [one] an opportunity to obtain an advantage over competitors who do not know or use it.
Developments In The Law  Competitive Torts, 77 Harv.L.Rev. 947 (1964); Restatement of Torts § 757, Comment b (1939). Trade secrets are property and rights therein are protected. American Tobacco Co. v. Evans, 508 So.2d 1057, 1059-60 (Miss. 1987). Cataphote Corp. v. Hudson, 444 F.2d 1313 (5th Cir.1971), addresses the law of trade secrets in the context of a Mississippi case.
Although a trade secret need not be so unique or novel as to be patentable, it must possess at least that modicum of originality which will separate it from everyday knowledge. In the words of our own prior opinion: "The subject matter of a trade secret must be secret. An item or process of public or general knowledge in an industry cannot be appropriated by one as his own secret." Where process or idea is so common, well known or readily ascertainable that it lacks all novelty, uniqueness and originality, it necessarily lacks the element of privacy necessary to make it legally cognizable as a trade secret... . Trade secret processes are not passed upon officially as are patented processes. Therefore, they are attended by no presumptions and the burden of proof is on the plaintiff to prove not only that the idea used by the defendant is his but also that it involves some elements above ordinary mechanical commonality and is something *1269 not already known to the public and to the trade generally.
Cataphote, 444 F.2d at 1315-17.
Certainly, while Williams was an officer and director of RRI, he occupied a trust relationship and owed a fiduciary duty to the corporation. Planhouse, Inc. v. Breland & Farmer, Etc., 412 So.2d 1164, 1166 (Miss. 1982). This duty carries with it the obligation to return any private property of the corporation after termination of employment. Id. Furthermore, this duty carries with it the obligation not to disclose or impinge upon any of the secret processes or business secrets of his former employer. Planhouse, 412 So.2d at 1166 n. 1.
Labels and linguistics aside, our question is whether Williams disclosed any RRI owned formula or other like information to third parties. When Williams and the others acquired the rice planted on the Barry place, they become free to do with it as they chose, so long as they did not unfairly compete with RRI. Implicated here are fact questions and we have before us a record reflecting substantially conflicting evidence. We decline to disturb the Chancery Court's gross resolution of the matter.

B.
During RRI's case-in-chief at the trial on the merits, Williams was questioned about the paragraph in his employment contract with RRI labeled "Nondisclosure Of Information Concerning Business." The lower court made a bench ruling in which it recognized that RRI was not trying to have the subject employment agreements construed as covenants not to compete, reasoning that there was nothing in RRI's prayer for relief seeking to restrain Williams from any type of competition, provided Williams did not use what RRI contended was material belonging to it.
In Williams' June 6, 1973, employment contract with RRI, Williams agreed that he would not
divulge, disclose, or communicate to anyone any information of any kind, nature or description concerning any matters affecting or relating to the business of employer, including ... the names of any of its customers, ... any seeds, samples, models or analyses relating to employer's products or processes, or any other information of, about, or concerning the business of employer, its manner of operation, its plans, processes, or other data of any kind, nature, or description... .
In the findings of fact regarding this matter, the Chancery Court held as follows:
As to barring Hughes from employing his skills as a plant breeder, if the employment contracts are construed to be covenants not to compete, they are void because unlimited as to time or geographic area, with no economic justification for such a restriction because of the protection afforded RRI under the trademark. (citations omitted)
RRI argues that the Court's ruling made during the trial and, apparently, its subsequent finding of fact regarding the employment contracts, were errors because the particular employment provision in issue was clearly not a covenant not to compete.
Certainly a corporation has the right to contract to prevent disclosure of information so long as such agreement is not overreaching. Lear Siegler, Inc. v. Ark-ell Springs, Inc., 569 F.2d 286, 289 (5th Cir.1978). Indeed, such an agreement cannot be challenged as an unreasonable restraint of trade. Id; Cataphote, 444 F.2d at 1316 n. 4; R. Callman, To The Law Of Unfair Competition, Trademarks and Monopolies, 363 (3d ed. 1968). RRI had every right to enter in such an agreement with Williams.
However, the important question in our appellate setting is whether there is overwhelming evidence in the record supporting the allegation that Williams disclosed any type of information protected by such agreement to a third party. Further, an even more fundamental question is whether Williams had lawful possession of the rice in controversy. For if Williams had rightful possession of the rice, then he had nothing of RRI and it would be impossible for him to disclose any such information as a result of obtaining the rice.
The Chancery Court appears to have been correct in focusing on the fundamental *1270 question of whether the rice was wrongfully taken, for the question of disclosure of trade secrets pursuant to the contractual provision is not reached until it be shown Williams wrongfully acquired the property, or there was substantial evidence otherwise indicating that he disclosed trade secrets to third parties. Suffice it to say that the evidence supports neither of these contingencies.

VI.
RRI finally complains of the Chancery Court's awarding of damages upon dissolution of the preliminary injunction. These damages were assessed by reference to Defendants' attorneys fees and litigation expenses incurred in resisting the action and obtaining dissolution of the preliminary injunction.
RRI argues that the gravamen of this civil action was title to and ownership of certain rice varieties. As such, any other equitable relief in the form of injunctions flowed from and was dependent upon that issue of ownership, and the efforts of the Defendants' attorneys in defending the suit on its merits were addressed to that issue. Accordingly, the Defendants were not entitled to an award of attorneys fees for dissolution of the injunction, or so RRI argues. RRI cites Lundy v. Greenville Bank & Trust Co., 179 Miss. 282, 174 So. 802, 814 (1937) for support of its proposition.
Williams argues that the Chancery Court exercised sound discretion in determining that the temporary restraining order and preliminary injunction had been issued improvidently and allowing attorneys fees as part of the damages. Williams contends that it is significant that the injunctions were kept in force throughout the proceedings, and were not dissolved until after the hearing on the merits. Citing Coleman v. Lucas, 206 Miss. 274, 39 So.2d 879 (1949) and Jones v. Day, 127 Miss. 136, 89 So. 906 (1921), as examples of this Court's rejection of the argument RRI makes in the instant case, Williams submits that the holding in these decisions is in accord with the general rule that a defendant is entitled to attorneys fees where an injunction has been wrongfully or improvidently issued because he has been forced to employ aid in getting rid of an unjust restriction imposed on him by act of the plaintiff. See 42 Am.Jur.2d, Injunctions, § 373.
If the relief sought is for an injunction alone, attorneys fees for dissolution must be allowed. Griffith, Mississippi Chancery Practice, § 464 (2d ed. 1950). See also Jones v. Day, 127 Miss. 136, 140, 89 So. 906 (1921); Bank of Philadelphia v. Posey, 130 Miss. 530, 539, 92 So. 840 (1922); Derdeyn v. Donovan, 81 Miss. 696, 700, 33 So. 652 (1902); Curphy v. Terrell, 89 Miss. 624, 631, 42 So. 235 (1906); Jamison v. Dulaney, 74 Miss. 890, 21 So. 972 (1897); see also 43A C.J.S. Injunctions § 340. However, where the prayer for injunction is ancillary to the main relief sought and the entire case is heard finally, and not separately on any preliminary motion to dissolve, attorneys fees should not be allowed. Griffith § 464; Howell v. McLeod, 127 Miss. 1, 8, 89 So. 774, 775 (1921); Mims v. Swindle, 124 Miss. 686, 690, 87 So. 151, 152 (1921); Giglio v. Saia, 140 Miss. 769, 778, 106 So. 513, 514 (1926); Hunter v. Hankinson, 141 Miss. 279, 288, 106 So. 514, 516 (1926); Staple Cotton Ass'n. v. Buckley, 141 Miss. 483, 486-87, 106 So. 747, 748 (1926); Staple Cotton Co-op Ass'n. v. Borodofsky, 139 Miss. 368, 374-75, 104 So. 91, 92 (1925); see also 43A C.J.S. Injunctions § 340; Kendrick v. Robertson, 145 Miss. 585, 598, 111 So. 99, 102 (1927) (attorneys fees on dissolution of an injunction are not allowable when the dissolution was upon final hearing on the merits); Lundy v. Greenville Bank & Trust Co., 179 Miss. 282, 322, 174 So. 802, 814 (1937) (when it is necessary that a cause proceed to a final hearing before it may be determined whether an injunction was properly sued out, attorneys fees are not allowable although there was a motion to dissolve and a separate hearing thereon); Silver Creek Co. v. Hutchens, 168 Miss. 757, 767-68, 151 So. 559, 562 (1934) (when the hearing on a motion to dissolve is continued by agreement to term time, this does not alter the hearing so as to make it final on the merits, and attorneys fees are allowable). But, where the entire relief sought is controlled by the injunction, attorneys *1271 fees are allowable, even though there is no preliminary motion to dissolve the injunction and the injunction is not dissolved until the final hearing on the merits. Coleman v. Lucas, 206 Miss. 274, 284, 39 So.2d 879 (1949); Jones v. Day, 127 Miss. at 136, 89 So. at 907.
All of this, upon reflection, only confuses the distinction between rights and remedies. RRI says the suit was about a matter of primary right, viz. title to and ownership of certain rice varieties. Williams and the other Defendants say the suit was for injunctive relief. Both are right. Properly understood, the rule is that, where injunctive relief is the primary remedy sought, fees and expense award follow dissolution of preliminary injunctive relief. And this is so wholly without regard to the nature of the primary right. The assignment of error is denied.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
NOTES
[1] In pertinent part, the final judgment of April 8, 1985, awarding damages provides as follows:

It is, accordingly, ORDERED, ADJUDGED AND DECREED:
5. That defendants, Hiter and Canady, do have and recover of plaintiff and FIDELITY & DEPOSIT COMPANY OF MARYLAND, surety upon its injunction bond, the sum of $26,501.17 in reasonable attorneys' fees and expenses, and the additional sums of $1,000.00, each, for damages suffered as the result of wrongful issue of said temporary restraining order and preliminary injunction.
6. That defendant, Arthur Hughes Williams, recover the sum of $2,500.00 as damages for wrongful issue of said orders, the defendant, Barton Williams, recover the sum of $2,060.00 as damages, and that both defendants recover reasonable attorneys' fees and expenses in the sum of $17,015.81, said recovery to be had against plaintiff and FIDELITY & DEPOSIT COMPANY OF MARYLAND, surety upon its injunction bond.
[2] Shortly after Williams' termination of employment with RRI, RRI filed a claim against him in the Chancery Court of the Second Judicial District of Bolivar County, Mississippi. This lawsuit was a charge by RRI that Williams had attempted to purchase Kokuho Rose seed in March, 1983. The suit was ultimately dismissed in consideration for which Williams transferred, quitclaimed and delivered to RRI all of his right, title and interest in approximately 11,440 bushels of long grain rice and medium grain rice, including Kokuho Rose type seed.
[3] Miss.R.Civ.P. 52 provides that in all actions tried by the court without a jury, the court shall, upon the request of any party or when required by the rules, find the facts specially and state conclusions of law separately. Where not requested or required by the rules, the chancellor may state findings of fact specially and conclusions of law separately. The rule mentions nothing about the method that the chancellor should employ in achieving these objectives. That is, the rule does not address the issue of whether it is proper for the chancellor to adopt findings of fact and conclusions of law that have been prepared by either party, specifically the prevailing party.